E-FILED
Tuesday, 12 May, 2020  10:33:45 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ALEKSEY ARKADYEVICH RUDERMAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Case No. 20-cv-2082** |
| | ) | |
| **CHAD KOLITWENZEW,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Interested Party.** | ) | |

## <u>ORDER AND OPINION</u>

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court is Petitioner Aleksey Arkadyevich Ruderman's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Doc. 1).  On April 10, 2020, after initial briefing and a hearing, the Court ordered Petitioner released on bond.

Now, after considering further briefing from the parties on the merits, the Court now GRANTS Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), and ORDERS Petitioner's continued

release until the risk of the COVID-19 pandemic subsides.  Further, the Court ORDERS Petitioner's release beyond the COVID-19 pandemic unless within 14 days of this order the Government obtains an order from an Immigration Judge, who has determined, after an individualized bond hearing in which the Government bears the burden of proof by clear and convincing evidence, that Petitioner's detention is necessary to prevent a risk of flight or a threat to public safety.  The Court's previous conditions of bond shall remain in effect until the stay at home order in Wisconsin, Petitioner's state of residence, is lifted or 14 days after this order, whichever is later.  However, this Order does not prevent the U.S. Department of Homeland Security or an Immigration Judge from imposing reasonable conditions of bond.  Pursuant to the Government's request, the Parties are ORDERED to provide this Court with a status update in 21 days informing the Court whether further Court involvement will be needed regarding Petitioner's continued release during the COVID-19 pandemic.

## I.  BACKGROUND

### A. The COVID-19 Pandemic

By now the details of the global COVID-19 pandemic are well-known to the parties and the general public.  While the first known case of COVID-19 in the United States was only reported in late January, the virus has spread exponentially and there are now over 1,324,488 known cases and over 80,000 known associated deaths in the United States alone.  See Cases of Coronavirus Disease (COVID-19) in the U.S., CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 12, 2020); United States Coronavirus Cases, Worldometers, https://www.worldometers.info/coronavirus/country/us/ (last visited May 12, 2020).  In Illinois, there have been at least 79,007 positive cases and 3,459 deaths from COVID-19.  See Coronavirus Disease 2019 (COVID-19) in Illinois Test Results, Ill. Dep't of Pub. Health, https://www.dph.illinois.gov/covid19 (last visited May 12, 2020).  Kankakee County, where the Jerome Combs Detention Center is located, there have been at least 557 positive cases and

30 deaths.  Id.  On March 30, 2020, shortly before this petition was filed, there were only 42 confirmed cases of COVID-19 and no associated deaths in Kankakee County.  Pet. at 3 (Doc. 1).

In response to COVID-19, the President of the United States declared a national state of emergency on March 13, 2020.  Illinois Governor JB Pritzker issued a disaster proclamation on March 9, 2020, regarding COVID-19 and has now extended a statewide stay-at-home order to May 29, 2020.  See Coronavirus Disease 2019 (COVID-19) in Illinois Test Results, Ill. Dep't of Pub. Health, https://www.dph.illinois.gov/covid19 (last visited May 11, 2020). Additionally, Governor JB Pritzker has ordered every person over the age of 2 years old to wear a face covering anytime they are unable to maintain six feet from others.  Id.

COVID-19 is particularly dangerous due to how easily it spreads, and the severity of the resulting illness.  The U.S. Center for Disease Control (CDC) reports that COVID-19 appears to spread from person-to-person, mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Coronavirus Disease 2019 Basics (May 9, 2020)

https://www.cdc.gov/coronavirus/2019-

ncov/faq.html#Coronavirus-Disease-2019-Basics (last visited May

9, 2020).  The virus spreads very easily through what is called

"community spread."  Id.  While infected individuals are thought to

be most contagious when they are showing symptoms, the virus

also appears to be spread by asymptomatic individuals.  Id.; see

also Transmission, CDC (May 6, 2020),

https://www.cdc.gov/coronavirus/2019-

ncov/hcp/faq.html#Transmission (last visited May 9, 2020) ("The

onset and duration of viral shedding and the period of

infectiousness for COVID-19 are not yet known.").  "[T]hose who

contract the virus may be asymptomatic for days or even for the

entire duration of the infection but can still transmit the virus to

others, making it more challenging to readily identify infected

individuals and respond with necessary precautions."  Mays v.

Dart, No. 20 C 2134, 2020 WL 1987007, at *2 (N.D. Ill. Apr. 27,

2020).

Symptoms of COVID-19 vary greatly between individuals.

Symptoms generally appear two to fourteen days after exposure.

Symptoms of Coronavirus, CDC (May 8, 2020)
https://www.cdc.gov/coronavirus/2019-ncov/symptoms-
testing/symptoms.html (last visited May 9, 2020).  Some
individuals appear to show no symptoms, while others individuals
will develop cough, shortness of breath or difficulty breathing, fever,
chills, repeated shaking with chills, muscle pain, headache, sore
throat, or a new loss of taste or smell.  Id.  In some individuals,
however, the symptoms can lead to serious illness or death.  Id.

Recent clinical evidence indicates that in persons who suffer
severe symptoms, the virus may also cause damage to organs such
as the heart, the liver, and the kidneys, as well as to organ systems
such as the blood and immune systems.  This damage is so
extensive and severe that it may be enduring.  Among other things,
patients who suffer severe symptoms from COVID-19 end up having
damage to the walls and air sacs of their lungs, leaving debris in the
lungs and causing the walls of lung capillaries to thicken so that
they are less able to transfer oxygen going forward.  Indeed, studies
of some recovered patients in China and Hong Kong indicate a
declined lung function of 20% to 30% after recovery.  Tianbing

Wang, et al., <u>Comorbidities and multi-organ injuries in the</u> <u>treatment of COVID-19</u>, 395 Lancet 10228 (2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext; <u>GW Hospital Uses Innovative VR</u> <u>Technology to Assess Its First COVID-19 Patient</u>, Geo. Wash. Univ. Hosp., (Mar. 19, 2020), https://www.gwhospital.com/resources/podcasts/covid19-vr-technology (last visited May 9, 2020).

And, while anyone is at risk of serious illness or death from COVID-19, certain individuals with underlying medical risks face a significantly higher risk.  Particularly relevant for this case, preliminary mortality rate analyses from a February 29, 2020 WHO-China Joint Mission Report indicated a mortality rate for individuals with hypertension at 8.4% and 8.0% for chronic respiratory disease.  Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Org., 12 (Feb. 29, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-finalreport.pdf; <u>see</u> <u>also</u> Pet. Ex. 1, Declaration of Dr. Carlos

Franco-Paredes at 2 (Doc. 1-1 at 1). (available online at
https://nipnlg.org/PDFs/practitioners/practice_advisories/gen/20
20_21Mar_COVID19_Appe ndix_F.pdf).

There is currently no cure and no vaccine for COVID-19.  The
only way to prevent the virus is to prevent it from spreading.  In
addition to frequent handwashing, the CDC recommends "social
distancing" or "physical distancing" from others by maintaining a
distance of at least 6 feet away from other people, avoiding
gathering in groups, and staying out of crowded places.  <u>Prevent
Getting Sick</u>, CDC (April 24, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/prevention.html (last visited May 9, 2020).  Additionally, the
CDC recommends face masks be worn at all times in settings where
social distancing is not possible.  <u>Id</u>.

Congregate settings, such as detention centers, present
unique risks and challenges for controlling the spread of COVID-19.
<u>See</u> <u>Interim Guidance on Management of Coronavirus Disease 2019
(COVID-19) in Correctional and Detention Facilities</u>, CDC (May 6,
2020), https://www.cdc.gov/coronavirus/2019-

ncov/community/correction-detention/guidance-correctional-
detention.html (last visited May 9, 2020); Dr. Anne Spaulding,
Coronavirus and the Correctional Facility: for Correctional Staff
Leadership (Mar. 9, 2020),
https://www.ncchc.org/filebin/news/COVID_for_CF_Administrator
s_3.9.2020.pdf ("A prison or jail is a self-contained environment,
both those incarcerated and those who watch over them are at risk
for airborne infections.  Some make an analogy with a cruise
ship."); Castillo v. Barr, No. CV2000605TJHAFMX, 2020 WL
1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("[T]he Government cannot
deny the fact that the risk of infection in immigration detention
facilities – and jails – is particularly high if an asymptomatic guard,
or other employee, enters a facility.").  Maintaining social distancing
is often not possible in a detention center without drastic
population reductions where detainees inevitably share cells and
common areas.  See also, Pet. Ex. 4, Letter from Drs. Scott Allen
and Josiah Rich to Congress at 4 (Mar. 19, 2020) (Doc. 1-1 at 50).
The rapid spread of COVID-19 through detention center
populations could lead to a "tinderbox scenario," where patient flow

from detention centers overwhelms local hospital systems, causing a devastating effect on public health.  Id. at 4 (Doc. 1-1 at 54).

In neighboring Cook County, Illinois, the danger has already manifested in a jail setting, with over 500 Cook County jail detainees testing positive for COVID-19 and seven detainee deaths, as well as at least 300 corrections officers testing positive and one corrections officer death.  See 800 Sickened, 7 Dead: Inmates And Guards Describe Life Inside Cook County Jail, WBEZ, https://www.wbez.org/stories/cook-county-jail-coronavirus-outbreak-personal-stories/df0d3e51-1232-493c-b24e-a018d6ff2058 (last visited May 9, 2020); 7th Cook County Jail Inmate Dies from COVID-19 Complications, NBC Chicago, https://www.nbcchicago.com/news/coronavirus/7th-cook-county-jail-inmate-dies-due-to-covid-19-complications/2267892/ (last visited May 9, 2020); Mays v. Dart, No. 20 C 2134, 2020 WL 1987007, at *25 (N.D. Ill. Apr. 27, 2020) (addressing a conditions of confinement claim brought by pre-trial detainees at the Cook County Jail and the challenges of containing the virus in a jail and ordering further injunctive relief).  Many other jails and detention

centers have already seen dangerous outbreaks of COVID-19 and
the difficulty in containing its spread within a facility.  See, e.g.,
United States v. Scparta, No. 18-CR-578 (AJN), 2020 WL 1910481,
at *1 (S.D.N.Y. Apr. 20, 2020) (discussing outbreak of COVID-19 at
FCI Butler); Chicago's Jail is Top U.S. Hot Spot as Virus Spreads
Behind Bars, NY Times, (Apr. 8, 2020),
https://www.nytimes.com/2020/04/08/us/coronavirus-cook-
county-jail-chicago.html (last visited May 9, 2020) ("Concerns about
the virus's spread have prompted authorities across the country to
release thousands of inmates, many of whom were awaiting trial or
serving time for nonviolent crimes.  But those measures have not
prevented a dizzying pace of infection among a population in which
social distancing is virtually impossible and access to soap and
water is not guaranteed.").

The CDC has published an extensive list of recommended
steps for detention facilities to take and notes that "[b]ecause many
individuals infected with COVID-19 do not display symptoms, the
virus could be present in facilities before cases are identified.  Both
good hygiene practices and social distancing are critical in

preventing further transmission." See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 9, 2020). Among other recommendations, the CDC recommends facilities implement social distancing strategies to increase physical space between detained persons to, ideally, six feet between all individuals. Id.

**B. Jerome Combs Detention Center's Preventive Measures**

As the Government reports, Jerome Combs Detention Center (JCDC), where Petitioner was being held prior to his release on April 10, 2020, has not yet had any detainee or staff member test positive for COVID-19. Resp., Declaration of Chad Kolitwenzew (Kolitwenzew Dec.), ¶ 9 (Doc.15-1). Respondent Warden Kolitwenzew's Declaration outlines the policies in place at JCDC, which he states have been in effect since on or before March 9, 2020, and comply with the CDC's recommendations. These measures include screening detainees and staff who enter the

facility.  Kolitwenzew Dec. at ¶ 13(C).  The last new ICE detainee entered JCDC on April 3, 2020.  Kolitwenzew Dec. at ¶ 13(B)(2). The screening includes taking the detainee's temperature and other vitals and housing all detainees separately from the general population for five to fourteen days.  Kolitwenzew Dec. at ¶ 13(C). While Respondent claims no detainee has developed flu-like symptoms, if one did, he would be isolated in a single cell. Kolitwenzew Dec. at ¶ 13(B)(3).  Respondent also states that "the JCDC staff has tested detainees for the presence of the COVID-19 virus, and all tests have come back negative."  Kolitwenzew Dec. ¶ 9.  It is unclear what the circumstances were that led to the tests or how many detainees have been tested.

Respondent also states that JCDC has increased the frequency of sanitation procedures and has provided sanitation supplies to detainees.  Kolitwenzew Dec. at ¶ 13(D).  JCDC conducts a disinfection routine three times a day, which includes door handles, toilets, showers, and tables.  Id.  JCDC staff are also provided with soap, sanitizing supplies, and masks.  Id. Respondent also states that JCDC has educated detainees

regarding the best practices they can employ to lower their risk of exposure to COVID-19.  Id.

Respondent states that JCDC medical personnel wear masks and visit the ICE detainee housing unit twice a day to check on detainees for COVID-19 symptoms, including temperature checks of each detainee twice a day.  Kolitwenzew Dec. at ¶ 13(G). Respondent also states that correctional staff visit the unit every 25 minutes and look for possible COVID-19 symptoms.  Id.

Respondent reports that while JCDC is a 450-bed facility, as of April 28, 2020, the total detainee population was only 320. Kolitwenzew Dec. ¶ 3.  The ICE detainees are housed separately from other detainees, and there are currently 62 male ICE detainees.  Id.  Respondent did not state the capacity of the ICE detainee unit, but he states that, since March 19, 2020, 93 male ICE detainees have been released from JCDC and no new ICE detainees have entered since April 3, 2020.  Id.  ICE detainees are housed in two-person or four-person rooms with access to a shared living space.

Respondent reports food trays come into the common area of the ICE housing unit twice per day and detainees line up to receive their food tray.  Kolitwenzew Dec. at ¶ 8.  Respondent reports that JCDC staff wear gloves, a hair net, and face mask and verbally remind the detainees to maintain a distance of six feet from the detainee in front of them.  Id.  Detainees then have a choice of eating at communal tables or in their own cell.  Id.  Posters in English and Spanish have also been posted to remind detainees to remain six feet apart from others.  Id.  Additionally, no social or attorney visits are permitted, and group gatherings, such as classes and religious events, have been cancelled.  Kolitwenzew Dec. at ¶ 13(A)(4).

## C. Petitioner's Health and Immigration History

At the time of filing his Petition on April 2, 2020, Petitioner was detained at JCDC.  Petitioner suffers from several preexisting medical conditions that may increase his risk of death or serious illness due to COVID-19 infection including hypertension, anxiety, chronic lymphadenitis, depression, hyperlipidemia, insomnia,

lumbago, and a swelling mass in his head or neck.  Petitioner was also a regular, heavy smoker up until 2008.

He is a native of Belarus and was paroled into the United States on January 27, 2001.  Gov't Resp., Declaration of Deportation Officer Del Rivero, (Del Rivero Decl.), ¶ 6 (Doc. 15-5). Petitioner, a Jewish man, was fleeing anti-Semitic persecution and was paroled under the "Lautenberg Amendment," Foreign Operations Appropriations Act, Public Law No. 101-167, §§ 599D–E, 103 Stat. 1195, 1261–64 (1989) (codified as amended at 8 U.S.C. §§ 1157 note (2000), 1255 note (2000)).

On July 20, 2002, Petitioner was convicted of driving under the influence of alcohol in Cook County, Illinois.  Del Rivero Decl. at ¶ 7.  Petitioner was convicted of Negligent Homicide by Motor Vehicle on August 31, 2008, in Milwaukee County, Wisconsin, after he struck and killed a pedestrian with his car while driving under the influence of alcohol.  Id. at ¶ 8.  He was sentenced to five years' imprisonment for this offense.  Id.  He was released from prison on August 20, 2013 and placed on extended supervision.  See Letter from Wisconsin Department of Corrections (Doc. 1-1 at 106).  He

was compliant with his conditions of supervision and placed on the lowest level of supervision possible.  Id.

In January 2016, Immigrations and Customs Enforcement (ICE), a federal law enforcement agency housed in the U.S. Department of Homeland Security (DHS), detained Petitioner and initiated removal proceedings against him.  He was issued a Notice to Appear, charging him with inadmissibility for being an arriving alien pursuant to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1182(a)(7)(A)(i)(I)) for being an immigrant who, at the time of application for admission, was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA.  Del Rivero Decl. at ¶ 9.

Before the Immigration Judge, Petitioner presented various applications for relief from removal.  On or about September 15, 2016, the Immigration Judge issued a written decision denying all of Petitioner's applications for relief and ordered him removed. Petitioner appealed to the Board of Immigration Appeals, and the BIA dismissed the appeal.  He then successfully appealed the BIA's

decision to the United States Court of Appeals for the Seventh Circuit.  In January 2019, the Seventh Circuit remanded Petitioner's case to the BIA for the BIA to "clarify" why it did not address his argument that he is not inadmissible under INA § 212(a)(2)(B), 8 U.S.C. § 1182(a)(2)(B) and for it to apply the proper legal standard to his application for a waiver of inadmissibility. Ruderman v. Whitaker, 914 F.3d 567, 571–72 (7th Cir. 2019).

On remand, the BIA once again found that Petitioner is inadmissible under § 212(a)(2)(B), 8 U.S.C. § 1182(a)(2)(B), clarifying its finding that Petitioner had waived his argument.  However, the BIA also remanded the case to the Immigration Judge for proceedings on Petitioner's waiver application consistent with the Seventh Circuit's opinion.  See Pet. Ex. 5, Decision of the Board of Immigration Appeals (Oct. 9, 2019) (Doc. 1-1 at 58).  Before, the Immigration Judge could conduct proceedings on Petitioner's waiver application, Petitioner filed a Motion to Reopen proceedings before the BIA on the ground of ineffective assistance of counsel by his prior pro bono attorneys pertaining to the § 212(a)(2)(B) issue. Upon docketing of that motion, the case was transferred back to the

BIA from the Immigration Court, where proceedings on Petitioner's waiver application had been ongoing.  Petitioner's Motion to Reopen remains pending before the BIA, and no briefing schedule or future hearings have been set.  The Government has given no indication as to when proceedings will continue.

Despite residing in the United States since 2001, Petitioner is classified as an "arriving alien" for purposes of his removal proceedings, and, prior to this Court's April 10, 2020 Order releasing him, he was being detained under the mandatory detention statute of 8 U.S.C. § 1225(b)(2)(A).  Accordingly, during Petitioner's four years of detention, he had not received an individualized bond hearing wherein the government was required to show that his continued detention was justified because he poses a flight risk or a danger to the community.

Petitioner filed multiple requests for release during his detention.  He first filed a motion for a custody redetermination shortly after being taken into ICE custody on January 14, 2016. See Pet. Ex. 6, Respondent's Motion for Bond Redetermination (Jan. 14, 2016), (Doc. 1-1 at 62).  The Immigration Judge denied his

motion on January 27, 2016 for lack of jurisdiction.  See Pet. Ex. 7,
Order of the Immigration Court with Respect to Custody (Jan. 27,
2016) (Doc. 1-1 at 67).  Petitioner then filed a second motion for a
bond hearing on September 27, 2017.  The Immigration Judge
again denied the motion for lack of jurisdiction.  See Pet. Ex. 8,
Memorandum Decision of the Immigration Judge (Nov. 20, 2017)
(Doc. 1-1 at 69).  Petitioner appealed this decision to the BIA, and
the BIA dismissed the appeal on February 13, 2018.  See Pet. Ex. 9,
Decision of the Board of Immigration Appeals (Feb. 13, 2018) (Doc.
1-1 at 74).  Neither the Immigration Judge nor the BIA made any
findings regarding Petitioner's flight risk or dangerousness to the
community.

Petitioner also filed a pro se Petition for Writ of Habeas Corpus
in the United States District Court for the Northern District of
Illinois on December 7, 2017.  Relying on cases which had read a
six-month reasonableness limitation into 8 U.S.C. § 1225(b)(2)(A),
he argued that the government lacked the statutory authority to
detain him indefinitely without a bond hearing.  See Pet. Ex. 10,
Petitioner's Brief in Support of a Writ of Habeas Corpus at 2–4 (Mar.

19, 2018), (Doc. 1-1 at 77).  While his petition was pending, the Supreme Court issued its decision in <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830 (2018), held that § 1225(b)(2)(A) cannot be read to include an implicit reasonableness limitation.  <u>Id</u>. at 845–46.  The district court denied Petitioner's petition on July 9, 2019, finding that he had not exhausted his administrative remedies and was not entitled to a bond hearing under § 1225(b)(2)(A) in light of <u>Jennings</u>.  <u>See</u> <u>Ruderman v. Devane</u>, No. 17 C 50369, Order at 2– 3 (N.D. Ill. July 9, 2019).  Notably, Petitioner had not raised the constitutional based claims he raises here.

Petitioner also requested release from detention under humanitarian parole from ICE pursuant to 8 U.S.C. § 1182(d)(5)(A) on February 5, 2019.  <u>See</u> Pet. Ex. 12, Aleksey Ruderman Humanitarian Parole Request (Feb. 5, 2019), (Doc. 1-1 at 91).  ICE denied his request on March 13, 2019, though it noted that Mr. Ruderman could "renew [his] request for parole at any time."  <u>See</u> Pet. Ex. 13, ICE Denial of Request for Humanitarian Parole (Mar. 13, 2019) (Doc. 1-1 at 94).  Petitioner then submitted a subsequent request for release from detention under humanitarian parole

through pro bono counsel on July 10, 2019.  <u>See</u> Pet. Ex. 14,

Humanitarian Parole Application for Aleksey Arkadyevich

Ruderman (July 10, 2019) (Doc. 1-1 at 97).  Petitioner

supplemented his second request for humanitarian parole in light of

the COVID-19 pandemic on March 25, 2020, but had not received a

reply as of filing this Petition.  <u>See</u> Supplement to Humanitarian

Parole Application for Aleksey Arkadyevich Ruderman Regarding

Urgent Humanitarian Threat Caused by COVID-19 Virus Pandemic

(Mar. 25, 2020) (Doc. 1-1 at 113).

### D. Petitioner's Petition for Writ of Habeas Corpus

Petitioner filed this Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2241 (Doc. 1) on April 2, 2020.  He argues

that his conditions of confinement during the COVID-19 pandemic,

in light of his underlying health conditions, violates his substantive

due process rights under the Fifth Amendment.  He also argues

that his prolonged four-year detention without an individualized

bond hearing violates his procedural and substantive due process

rights under the Fifth Amendment.

After a hearing on April 10, 2020, and after considering the initial briefs of the parties, this Court granted Petitioner release on bond pending a decision on the merits of his claim.  The parties have now filed additional briefing, and the case is ripe for a decision on the merits.

## II. DISCUSSION

Petitioner alleges he is entitled to release because, in light of his preexisting medical conditions and the COVID-19 pandemic, his conditions of confinement violate his substantive due process rights under the Fifth Amendment.  Additionally, Petitioner alleges that he is entitled to release because his detention without a bond hearing has become unconstitutionally prolonged, also in violation of the Due Process Clause of the Fifth Amendment.  The Government challenges the Court's habeas jurisdiction as well as the merits of Petitioner's claims.  However, for the reasons below, the Court finds that the Court has habeas corpus jurisdiction under 28 U.S.C. § 2241 to consider Petitioner's claims and that Petitioner's claims succeed on the merits.

As an initial matter, the parties briefs appear to disagree as to whether the Court's analysis should be conducted in terms of a decision on the merits of Petitioner's habeas case or as a preliminary injunction.  The Court's original understanding was, after additional briefing, that the Court would be prepared to rule on the merits of Petitioner's habeas petition.  See April 13, 2020 Text Order.  Unlike similar cases in other courts, Petitioner has not framed his challenge as a request for a preliminary injunction. Compare Pet. (Doc. 1), with, e.g., Thakker v. Doll, No. 1:20-CV-480, 2020 WL 1671563, at *1 (M.D. Pa. Mar. 31, 2020).  Further, as the Court finds its authority to release Petitioner is rooted in habeas corpus, the Court elects to reach a final decision on the merits of Petitioner's habeas claim.  Moreover, the Court notes that the distinction is largely unimportant here, as habeas relief is, in essence, a form of injunctive relief.  Accordingly, the Government's concerns and arguments raised in the context of a preliminary injunction are fully encompassed in the Court's analysis on the merits of Petitioner's Habeas Corpus Petition.

**A. Petitioner's Claims Are Properly Raised in a Habeas Corpus Petition.**

A federal court may grant the writ of habeas corpus if a detainee "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(a), (c)(3); see INS v. St. Cyr, 533 U.S. 289, 305 (2001).  A petition seeking habeas corpus relief is appropriate under 28 U.S.C. § 2241 when a petitioner is challenging the fact or duration of his confinement.  Preiser v. Rodriguez, 411 U.S. 475, 490, 93 S.Ct. 1827 (1973); Waletzki v. Keohane, 13 F.3d 1079, 1080 (7th Cir. 1994).  Habeas corpus has been recognized as an appropriate vehicle through which noncitizens may challenge the fact of their civil immigration detention.  See Zadvydas v. Davis, 533 U.S. 678, 688 (2001); see generally Jennings v. Rodriguez, 138 S. Ct. 830 (2018).

The Government argues that Petitioner's conditions of confinement claim cannot be addressed in a habeas corpus petition because the proper remedy is not release, but a judicially mandated change in conditions.  Indeed, in most circumstances, the Seventh

Circuit has found that a claim of unconstitutional conditions of
confinement or failure to provide medical treatment would not
entitle a Petitioner to release.  See, e.g., Robinson v. Sherrod, 631
F.3d 839, 840-841 (7th Cir. 2011) (recognizing the "long-standing
view that habeas corpus is not a permissible route for challenging
prison conditions" that do not bear on the duration of confinement);
Glaus v. Anderson, 408 F.3d 382, 387 (7th Cir. 2005) (concluding
that because "release from custody is not an option" for a claim that
alleges that "medical treatment amounts to cruel and unusual
punishment" in violation of the Eighth Amendment, it cannot be
addressed in habeas).

However, the Seventh Circuit has also recognized that "the
Supreme Court [has] left the door open a crack for prisoners to use
habeas corpus to challenge a condition of confinement."  Robinson
v. Sherrod, 631 F.3d 839, 840 (7th Cir. 2011) (internal quotation
marks and citations omitted); see also Aamer v. Obama, 742 F.3d
1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the
conditions of his confinement in a federal habeas corpus petition);
Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008) (same).

Courts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition.  See, e.g., Hernandez v. Kolitwzew, Case No. 2:20-cv-2088-SLD, Order, d/e 12 (C.D.Ill. Apr. 23, 2020) ("While a "run-of-the-mill" condition of confinement claim may not touch upon the fact or duration of confinement, here, Petitioner is seeking immediate release based upon the claim that there are essentially no conditions of confinement that are constitutionally sufficient given the facts of the case."); Engelund v. Doll, No. 4:20-CV-00604, 2020 WL 1974389, at *7 (M.D. Pa. Apr. 24, 2020); Coreas v. Bounds, No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020); Thakker, et. al, v. Doll, No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020).  But see Dawson v. Asher, No. 20-409, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) (declining to address whether the court had habeas jurisdiction, but noting that "even if Plaintiffs could show a Fifth Amendment violation, Plaintiffs provide no authority under which such a violation would justify immediate release, as opposed to injunctive relief that would leave Plaintiffs

detained while ameliorating any alleged violative conditions within the facility."). <u>See</u> <u>also</u>, Pet. Reply at 4 (Doc.16) (listing numerous similar cases where civil immigration detainee petitioners have been ordered released when bringing conditions of confinement claims related to their underlying medical conditions and the COVID-19 pandemic).

Here, the Court finds that Petitioner's conditions-of-confinement claim directly bears on not just his conditions of confinement, but whether the <u>fact</u> of his confinement is constitutional in light of the conditions caused by the COVID-19 pandemic. Accordingly, the Court finds that his claim can proceed in a habeas corpus petition and the Court proceeds to a determination of the merits.

**B. The Due Process Clause of the Fifth Amendment Requires that Petitioner be Granted an Individualized Bond Hearing Due to his Prolonged Detention.**

The Court begins with addressing Petitioner's prolonged detention claim. Petitioner argues that his prolonged detention of nine months without an individualized bond hearing violates his

Due Process rights under the Fifth Amendment.  Petitioner is being

detained pursuant is classified as an arriving alien pursuant to 8

U.S.C. § 1225 provides that aliens arriving at the country's borders

are deemed "applicants for admission," and must be inspected by

an immigration official before being granted admission. 8 U.S.C.

§ 1225(a)(3).  Section 1225(b) then provides that "if the examining

immigration officer determines that an alien seeking admission is

not clearly and beyond a doubt entitled to be admitted, the alien

shall be detained for [removal proceedings]."  8 U.S.C.

§ 1225(b)(2)(A).

As discussed above, it is well-established that federal courts

have jurisdiction to review the constitutionality of a non-citizen's

detention under § 1226(c).  See Jennings v. Rodriguez, 138 S. Ct.

830, 841 (2018); Demore v. Kim, 538 U.S. 510, 517, 123 S. Ct.

1708, 1714 (2003).  It is also "well established" that non-citizens in

removal proceedings are entitled to the protections of the Fifth

Amendment.  See Kim, 538 U.S. at 523.  In evaluating a due

process claim, the Court "is required to evaluate the private

interest, the probability of error (and the effect of additional

safeguards on the rate of error), and the government's interest in dispensing with those safeguards, with a thumb on the scale in favor of the statute's constitutionality." Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, (1976)).

The Supreme Court, in analyzing the post-removal order detention statute, 8 U.S.C. § 1231, has held that indefinite detention of a non-citizen would violate the Fifth Amendment's Due Process Clause. Zadvydas v. Davis, 533 U.S. 678, 690 (2001) (holding that after a six-month presumptively reasonable period, a non-citizen's detention under the post-removal statute could only continue if there was a "significant likelihood of removal in the reasonably foreseeable future"). However, in Demore v. Kim, 538 U.S. 510 (2003), the Supreme Court rejected a facial challenge to the constitutionality of the related mandatory detention statute, 8 U.S.C. § 1226(c), which mandates an alien's detention during their immigration proceedings if they have been convicted of certain crimes, finding that indefinite detention was not authorized under the statute because the detention has a "definite termination point,"

when the removal proceedings conclude.  <u>Id.</u> at 529.  In <u>Kim</u>, the Supreme Court found that, unlike the statute in <u>Zadvydas</u>, the detention authorized under § 1226(c) was of a much shorter duration because in the majority of cases a removal proceeding takes less than 90 days and, if the removal order is appealed, would still only take an average of four months longer.  <u>Id.</u>

However, Justice Kennedy's concurrence in <u>Kim</u> suggested that a non-citizen detained under § 1226(c) would still be "entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." <u>Id</u>. at 532 (Kennedy, J., concurring).  Moreover, as the Seventh Circuit recognized in <u>Gonzalez v. O'Connell</u>, 355 F.3d 1010 (7th Cir. 2004), in <u>Kim</u>, "the detainees at issue conceded their deportability" and that "<u>Kim's</u> holding was expressly premised on that fact." <u>Id</u>. at 1019.  Accordingly, the Seventh Circuit explained that <u>Kim</u> "left open the question of whether mandatory detention . . . is consistent with due process when a detainee makes a colorable claim that he is not in fact deportable." <u>Id</u>. at 1019–20.

Recently, in <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830 (2018), the Supreme Court again addressed a challenge to detention under §§ 1225(b)(1)-(2) and 1226(c) and held that an implicit "reasonableness" limitation of six-months before providing a bond hearing could not be plausibly read into the statute under the canon of constitutional avoidance.  <u>Id.</u> at 847 (noting the differences between the language of §§ 1225(b)(1)-(2) and 1226(c) versus § 1231, in which the Supreme Court in <u>Zadvydas</u> did read an implicit reasonableness limitation).  As <u>Jennings</u> noted, § 1226(b) "does not on its face limit the length of the detention it authorizes," as it only ends when immigration proceedings have been concluded and the non-citizen is either released or removed.  <u>Id.</u> at 846. <u>Jennings</u>, however, did not address the constitutional question, remanding that question to the Ninth Circuit.  <u>Id.</u> at 851.

While the Government argues that Petitioner's claim must be denied in light of <u>Jennings</u> and <u>Kim</u>, as suggested by Justice Kennedy's concurrence in <u>Kim</u>, the Court finds that both of these cases have left open individualized challenges to a non-citizen's detention under § 1225(b) when the non-citizen has a good-faith

defense to removal.  And, while Petitioner, as an arriving alien, may have fewer due process rights than an individual who has entered the United States, see, e.g., Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."), courts across the country have rejected the notion that individuals such as Petitioner have no due process right.  See, e.g., Ahad v. Lowe, 235 F. Supp. 3d 676, 682 (M.D. Pa. 2017) (collecting cases and noting "that developing case law has consistently determined that detained aliens are entitled to some essential measure of due process in the form of a bond hearing once their detention reaches an unreasonable duration"); Wang v. Brophy, No. 17-CV-6263-FPG, 2019 WL 112346, at *3 (W.D.N.Y. Jan. 4, 2019) (collecting cases for proposition that an arriving alien "has sufficient due process rights to challenge his prolonged mandatory detention"); Jamal A. v. Whitaker, 358 F. Supp. 3d 853, 858 (D. Minn. 2019) (finding arriving aliens have due process rights, but, "as a practical matter," if arriving noncitizens are entitled to lesser due process protections than other

noncitizens, "then the former can be detained somewhat longer than the latter," but "under the Due Process clause, neither group of aliens can be detained indefinitely (at least without some kind of showing that they are likely to flee or harm the community)"); see also Castro v. U.S. Dep't of Homeland Sec., 835 F.3d 422, 449 n.32 (3d Cir. 2016) ("We doubt . . . that Congress could authorize, or that the Executive could engage in, the indefinite, hearingless detention of an alien simply because the alien was apprehended shortly after clandestine entrance.").

Having determined that Petitioner has a right to an individualized bond hearing if his detention becomes unreasonable, the Court also finds that Petitioner's four-year detention has become unreasonable.  In evaluating an unreasonable detention claim for mandatory detention under § 1226(c), courts have looked to various case-specific factors, including the overall length of the detention, the reason for the delay, the likelihood of eventual removal, the likely duration of future detention, and the conditions of detention, and balanced them against the Government's legitimate interest in detention.  See, e.g., Parzych v. Prim, No. 19 C

50255, 2020 WL 996559, at *3 (N.D. Ill. Mar. 2, 2020); <u>Baez-Sanchez v. Kolitwenzew</u>, 360 F. Supp. 3d 808, 815-16 (C.D. Ill. 2018); <u>Hernandez v. Decker</u>, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *10 (S.D.N.Y. July 25, 2018); <u>Vargas v. Beth</u>, 378 F. Supp. 3d 716, 727 (E.D. Wis. 2019), <u>appeal dismissed,</u> No. 19-1965, 2019 WL 6133750 (7th Cir. July 18, 2019).

The Court finds these factors equally useful here and concludes, given the totality of the circumstances, that Petitioner's detention has become unreasonably prolonged and the Due Process Clause of the Fifth Amendment requires an individualized bond hearing.  Petitioner had been detained for over four years, significantly longer than the 90-day average assumed in <u>Kim</u> or the six-month presumed reasonable period of <u>Zadvydas</u>.  His detention has not been in any conditions meaningfully different than a penal institution, despite its classification as "civil" detention. <u>See</u> <u>also</u>, <u>Chavez-Alvarez v. Warden York County Prison</u>, 783 F.3d 469, 478 (3d Cir. 2015) ("As the length of the detention grows, the weight given to this aspect of his detention increases.").  Moreover, the conditions of detention during the COVID-19 pandemic, as

discussed below, have made this factor fall even more in Petitioner's favor.

The Government argues that the delay in his proceedings, leading to the four-year detention, is ultimately Petitioner's fault for pursuing his legal rights.  This argument makes little sense. Petitioner has been successful in his appeals to the Seventh Circuit, which found flaws in the proceedings of the Immigration Judge and the BIA.  The Court finds that these errors are attributable to the Government, not Petitioner.  See also Diop v. ICE/Homeland Sec., 656 F.3d 221, 234 (3d Cir. 2011) (concluding "that reasonableness must take into account errors in the proceedings that cause unnecessary delay. No system of justice can be error-free, and those errors require time to fix.").  Notably, the Government has not argued that Petitioner's appeals are not in good faith or that they are intended to "postpone[e] inevitable deportation," or to try to "game the system."  Baez-Sanchez v. Kolitwenzew, 360 F. Supp. 3d 808, 816 (C.D. Ill. 2018).  Also notably, the Government has provided no timeline as to when Petitioner's proceedings will continue.  Especially in light of the COVID-19 pandemic, there may

be considerable additional delay before Petitioner's proceedings conclude.

While "[t]he Court recognizes that the Government has a valid interest in requiring detention during removal hearings to ensure that removable aliens appear for their removal hearings, the additional safeguard of a bond hearing to make an individualized determination as to [Petitioner's] flight risk and dangerousness would not impede this purpose." Baez-Sanchez, 360 F. Supp. 3d at 816 (C.D. Ill. 2018). In light of the totality of the circumstances, the Court finds that Petitioner's continued detention without an individualized bond hearing has become unreasonable, and due process now requires an individualized bond hearing in which the Government must prove by clear and convincing evidence that Petitioner's continued detention is justified based on his flight risk or danger to the community.

Absent the COVID-19 pandemic the Court would be unlikely to order release prior to giving the Government an opportunity to conduct an individualized bond hearing in Petitioner's removal proceedings. However, given the substantial risk involved by

continuing to detain Petitioner during the COVID-19 pandemic and
the Government's lack of any meaningful argument regarding
Petitioner's dangerousness or flight risk, the Court finds that
Petitioner's continued release is appropriate.  However, Petitioner's
release on this claim would no longer be authorized if, within 14
days of this order, an immigration judge holds a bond hearing and
enters an order finding that Petitioner's continued detention is
necessary to prevent a risk of flight or a threat to public safety.

## C. Petitioner's Conditions of Confinement Violate His Fifth Amendment Due Process Rights.

The emergency nature of Petitioner's Petition stems from his
conditions of confinement claim.  Petitioner challenges the
conditions of his confinement, arguing, in light of the COVID-19
pandemic, his underlying health conditions, and JCDC's
insufficient measures to prevent the spread of COVID-19, that he is
entitled to release.  Petitioner, as a civil immigration detainee,
brings his claim under the Due Process Clause of the Fifth
Amendment.  The Seventh Circuit has recently clarified that a
conditions of confinement claim based on due process is analyzed

under the objective inquiry standard announced in <u>Kingsley v.
Hendrickson</u>, 576 U.S. 389 (2015).  <u>Hardeman v. Curran</u>, 933 F.3d
816 (7th Cir. 2019).  While <u>Hardeman</u> addressed a conditions-of-
confinement claim for pretrial detainees under the Fourteenth
Amendment, the same standards apply to federal civil immigration
detainees bringing claims under the Fifth Amendment.  <u>See</u>, <u>e.g.</u>,
<u>Belbachir v. Cty. of McHenry</u>, 726 F.3d 975, 979 (7th Cir. 2013)
(applying same standards to civil immigration detainee as to pretrial
detainee).

To prevail on a conditions of confinement claim, Petitioner
must prove: "(1) the conditions in question are or were objectively
serious (or if the claim is for inadequate medical care, his medical
condition is or was objectively serious); (2) the defendant acted
purposefully, knowingly, or recklessly with respect to the
consequences of his actions; and (3) the defendant's actions were
objectively unreasonable—that is, "not rationally related to a
legitimate governmental objective or ... excessive in relation to that
purpose." <u>Hardeman</u>, 933 F.3d at 827 (Sykes, J., concurring)
(quoting <u>Kingsley</u>, 135 S. Ct. at 2473–74).  The third requirement is

rooted in the Supreme Court's decision in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), where the Supreme Court instructed that, in determining whether "particular restrictions and conditions accompanying pretrial detention amount to punishment," courts "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." <u>Id</u>. at 538. <u>Kinglsey</u> clarified that "[i]n the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.' " <u>Kingsley</u>, 135 S. Ct. at 2473 (quoting <u>Bell</u>, 441 U.S. at 561, 99 S.Ct. 1861).

With regard to the first requirement, the conditions involved are sufficiently serious. <u>See also</u>, <u>Mays v. Dart</u>, No. 20 C 2134, 2020 WL 1987007, at *23 (N.D. Ill. Apr. 27, 2020) (finding that there is "no question that the plaintiffs' claims involve conditions that are sufficiently serious to invoke the Fourteenth Amendment"). The COVID-19 pandemic has infected over 1.3 million people and

claimed over 80,000 lives in the United States alone.  The situation

at the Cook County Jail and others across the country has shown

just how rapidly this virus can spread in a jail-like setting.  For

individuals like Petitioner, with a heightened risk of serious illness

or death from COVID-19, there can be no doubt that the conditions

are objectively serious.  Nor does the second requirement appear to

be in dispute.  The Government and JCDC have not disputed that

they are aware of the serious risks related to the COVID-19

pandemic or that they are aware of Petitioner's heightened risk due

to his underlying health conditions.

The parties' dispute centers around the third requirement—

whether the Government's actions are objectively unreasonable.

The Government has a legitimate nonpunitive interest in detaining

individuals like Petitioner pending the execution of a valid removal

order against them.  See Demore, 538 U.S. at 528; Zadvydas, 533

U.S. at 690.

The Government argues that Petitioner cannot show that there

is an objectively unreasonable risk of harm in light of this legitimate

nonpunitive interest because JCDC has taken reasonable steps to

protect the detainees from COVID-19.  As detailed above and in
Warden Kolitwenzew's declaration, JCDC has implemented a
number of policies to prevent the introduction and spread of
COVID-19.  The Government places great weight on its claim that it
has largely implemented all of the guidance from the CDC.
However, as other courts have found, the CDC's guidelines, while
important, are not dispositive standing alone.  Mays, 2020 WL
1987007, at *27; Malam v. Adducci, No. 20-10829, 2020 WL
1899570, at *4 (E.D. Mich. Apr. 17, 2020) (addressing limits of CDC
guidance and noting that they only make recommendations for
precautionary measures but [do] not assess the resulting risk
of COVID-19 infection once those measures have been
implemented.").

Moreover, the Court finds that JCDC measures are
insufficient to minimize Petitioner's risk of harm given the
Government's limited continued interest in Petitioner's detention.
As to spread, notably, the detention center is not at capacity—
although the capacity of the ICE detainee unit in relation to the jail
was not provided.  However, while the Court presumes the jail is

below normal capacity, "the appropriate capacity of a jail during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances." <u>Basank v. Decker</u>, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020). The facility has also increased sanitation measures and "encouraged" social distancing.  However, Warden Kolitwenzew's declaration concedes that detainees share sleeping spaces and have access to a shared living space.  While individual isolation may not be needed, the Government makes no attempt to argue that JCDC is actually enforcing CDC-recommended social distancing beyond merely posting signs and reminding detainees of distancing only while lined up for meals.  Such a policy is likely particularly ineffective given the language barriers of ICE detainees.  Given the lack of meaningful ability to social distance, should any staff member or detainee contract COVID-19, it would likely be only a matter of time before the virus would spread.

The Government also importantly points out that there are no known cases of COVID-19 in the facility.  However, many other courts have found that release was still appropriate despite there

being no evidence of COVID-19 in the facilities in light the

individual petitioner's health conditions and inadequate

precautions taken at the facility to prevent potential introduction

and spread of COVID-19.  See, e.g., Fofana v. Albence, No. 20-

10869, 2020 WL 1873307, at *9 (E.D. Mich. Apr. 15, 2020)

(releasing ICE detainee with underlying medical conditions placing

him at high risk); Malam v. Adducci, No. 20-10829, 2020 WL

1899570, at *3 (E.D. Mich. Apr. 17, 2020) (rejecting Respondent's

argument that "that until there is a confirmed case of COVID-19, or

perhaps an outbreak of the illness it causes, in the Calhoun County

Correctional Facility, Petitioner cannot show that COVID-19 poses

an unreasonable risk of infection" as "fly[ing] in the face of public

health experts").  Moreover, a lack of COVID-19 cases only matters

if there are sufficient measures in place to prevent it from

entering—as it is unquestionably spreading in Illinois and

Kankakee County.  JCDC states that it has not allowed new

detainees to enter since April 3, 2020.  However, it also appears

from Warden Kolitwenzew's declaration that detainees still must go

back and forth for immigration court appearances.  While detainees

may be given a mask during transport, it is not clear that use of the mask is mandated or that it is the type of mask, such as a N95, that would prevent a detainee from getting the virus, as opposed to preventing them from spreading it.  Staff, too, obviously must enter and exit JCDC—each time potentially bringing the virus into the JCDC.  Again, while the evidence shows that staff have access to masks, there is no evidence showing they are required to wear them.

JCDC has also established screening measures for both staff and detainees.  Screening, however, will only allow the facility to identify individuals with active symptoms, not those asymptomatic individuals who can nevertheless spread the virus undetected.  The Government's response does not address the potential for asymptomatic spread, and JCDC does not appear to be mandating use of masks by its staff or detainees that would help to contain any asymptomatic spread.  The Government indicates that some testing has been done, but it does not indicate the scope of testing, or why certain individuals were tested.

The Government also argues, within the context of standing,
that Petitioner's claim cannot proceed because he has not alleged a
cognizable injury.  As the Supreme Court has made clear, however,
a petitioner need not wait until he is actually injured in order to
obtain preventive relief.  Helling v. McKinney, 509 U.S. 25, 33
(1993).  "It would be odd to deny an injunction to inmates who
plainly proved an unsafe, life-threatening condition in their prison
on the ground that nothing yet had happened to them."  Id.  The
risk of exposure to COVID-19 constitutes exactly the type of
"unsafe, life-threatening condition" that "need not await a tragic
event" in order to be remedied.  Id. at 33-34.  And, here, unlike the
toxin at issue in Helling, any exposure to COVID-19 would present
Petitioner with a substantial risk of serious illness or death.  See
also, Bent v. Barr, No. 19-CV-06123-DMR, 2020 WL 1812850, at *3
(N.D. Cal. Apr. 9, 2020) ("Given the exponential spread of the virus,
the ability of COVID-19 to spread through asymptomatic
individuals, and the inevitable delays of court proceedings, effective
relief for Bent and other detainees may not be possible if they are
forced to wait until their particular facility records a confirmed

case."); <u>United States v. Kennedy</u>, 2020 WL 1493481, at *5 (E.D.

Mich. Mar. 27, 2020) ("[W]aiting for either Defendant to have a

confirmed case of COVID-19, or for there to be a major outbreak in

Defendant's facility, would render meaningless this request for

release."); <u>Thakker</u>, 2020 WL 1671563, at *2 ("Respondents would

have us offer no substantial relief to Petitioners until the

pandemic erupts in our prisons. We reject this notion.").

The Government also argues that Petitioner has a risk of

contracting COVID-19 out in the community as well, making his

release not likely to reduce his potential exposure to the virus.

However, the Court disagrees.  Petitioner's risk is obviously

substantially reduced when Petitioner is in control of social

distancing and other preventive measures, rather than relying on

the voluntary actions of dozens of fellow detainees and detention

staff to take preventative measures.  <u>See</u> <u>also</u>, <u>Coreas v. Bounds</u>,

No. CV TDC-20-0780, 2020 WL 1663133, at *6 (D. Md. Apr. 3,

2020) (relying on expert opinions to conclude that it was

implausible to claim "someone will be safer from a contagious

disease while confined in close quarters with dozens of other detainees and staff than while at liberty").

Furthermore, while for most individuals, JCDC's measures would likely be more than sufficient to survive a due process challenge, Petitioner's unique medical conditions place him at an increased risk of serious illness or death.  As explained above, the Government's legitimate interest in detaining Petitioner is already greatly diminished absent a showing that he is a danger to the community or a flight risk—which the Government has not plausibly made at this time—due to his unreasonably prolonged detention without an individualized bond hearing.  While the Court agrees Petitioner has not shown that the Government has any express intent to punish him, the Court finds that, considering the totality of the circumstances, Petitioner's detention appears "excessive in relation to" the Government's "legitimate nonpunitive governmental purpose" for detaining him.  Kingsley, 135 S. Ct. at 2473 (quoting Bell, 441 U.S. at 561, 99 S.Ct. 1861).  Petitioner's continued detention under these conditions is not objectively reasonable nor is it logically related to the Government's interest in

ensuring Petitioner's presence at his removal hearing when there
are "a plethora of means other than physical detention at [the
Government's] disposal by which they may monitor civil detainees
and ensure that they are present at removal proceedings, including
remote monitoring and routine check-ins." Thakker, et. al, v. Doll,
No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); see
also Fraihat, 2020 WL 1932570 at *26 ("[A]ttendance at hearings
cannot be secured reliably when the detainee has, is at risk of
having, or is at risk of infecting court staff with a deadly infectious
disease with no known cure. Participation in immigration
proceedings is not possible for those who are sick or dying, and is
impossible for those who are dead."); Malam v. Adducci, No. 20-
10829, 2020 WL 1899570, at *6 (E.D. Mich. Apr. 17, 2020) (noting
that, unlike the other habeas cases, the Government "has
additional precautionary measures at [its] disposal: the release of
Petitioner," and noting that "ICE has released other detainees due
to the risks of COVID-19").  Accordingly, the Court finds that
Petitioner is entitled to relief on his conditions of confinement claim
until the risks of the COVID-19 pandemic subside.

### III. CONCLUSION

For the reasons stated above, Petitioner Aleksey Arkadyevich Ruderman's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Doc. 1) is GRANTED.  The Court ORDERS Petitioner's continued release until the risk of the COVID-19 pandemic subsides.  Further, the Court ORDERS Petitioner's release beyond the COVID-19 pandemic unless within 14 days of this Order the Government obtains an order from an Immigration Judge, who has determined, after an individualized bond hearing in which the Government bears the burden of proof by clear and convincing evidence, that Petitioner's detention is necessary to prevent a risk of flight or a threat to public safety.  The Court's previous conditions of bond shall remain in effect until the stay at home order in Wisconsin, Petitioner's state of residence, is lifted or 14 days after this order, whichever is later.  However, this Order does not prevent the U.S. Department of Homeland Security or an Immigration Judge from imposing reasonable conditions of bond. Pursuant to the Government's request, the Parties are ORDERED to provide this Court with a status update in 21 days informing the

Court whether further Court involvement will be needed regarding

Petitioner's continued release during the COVID-19 pandemic.


ENTER: May 12, 2020


/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE